# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

GAN H. ENG, TAN F. LAM,                    )
KWOK C. TANG, JUN Q. CHAN,                 )
KAM C. HO, XIAO Z. ZHANG,                  ) 07 Civ 3909
YAT C. CHAN, MING HO, RONG J.              )
CHEN, JIAN Z. LUO, LE Y. CHEN,             )
JIAN B. YAN, SU C. JIANG,                  )
XIU H. JIANG, XIU LIN, TAK S.              )
CHENG, SHU C. HUANG, MEI J.                )
HUANG and OY K. KWAN,                      )
                                           )
                Plaintiffs,                )
                                           )
        vs.                                )
                                           )
THE NICE RESTAURANT, INC.,                 )
BEN H. TOM, MEE MEE TOM a.k.a.             )
MEE MEE M. THOM a.k.a. MEE MEE             )
MEI, YAN SHING CHAN, CHEUNG                )
YONG, SHING SI SUN, SHEN PING              )
CHU, JOHN TAM, SI KIT WU,                  )
SI HUNG WU, CHUI BAI TAM, and              )
JIMMY MOY a.k.a. JIMMY MUI                  )
a.k.a. JIMMY MEI,                          )
                                           )
                Defendants.                )
----------------------------)

DEPOSITION OF WILLIAM TAM
New York, New York
Tuesday, February 26, 2008

Reported by:
KRISTIN KOCH, RPR, RMR, CRR, CLR
JOB NO. 15170

1                           W. Tam

2        A.      I was born in Hong Kong.

3        Q.      How old are you, sir?

4        A.      59.

5        Q.      This is a question you are allowed

6    to lie to, but I accept that as the truth,

7    although you look younger.

8        A.      Thank you.

9        Q.      And when did you come to this

10   country?

11       A.      1968.

12       Q.      I am going to ask you some questions

13   about your educational background.

14       A.      Sure.

15       Q.      Did you attend school in Hong Kong

16   or China before coming to the United States?

17       A.      I attend high school in Hong Kong.

18       Q.      When you came to the United States,

19   what schools did you attend here?

20       A.      I went to Whener College for the

21   first year, and then I transferred to Pace

22   University and I get my BBA over there.

23       Q.      What is your BBA in?

24       A.      Accountant.

25       Q.      Did you get any further education in

1                          W. Tam

2    this country?

3        A.    I went to NYU.

4        Q.    And did you get a master's?

5        A.    That's correct.

6        Q.    In accounting as well?

7        A.    No.  Finance.

8        Q.    Did you get any other degrees after

9    your master's?

10       A.    No.  That's it.

11       Q.    I understand that you are a CPA; is

12   that correct?

13       A.    That's correct.

14       Q.    And you are licensed in New York as

15   a CPA; is that correct?

16       A.    That's correct.

17       Q.    Do you recall what year it was that

18   you obtained your CPA license, approximately?

19       A.    Approximately '79.  One year before

20   or after.  All right?

21       Q.    That's fine.

22       A.    Okay.

23       Q.    Between the time that you came to

24   this country in 1968 and 1979, were you

25   employed at any time?

1                          W. Tam

2        A.     Yes.

3        Q.     Can you tell me where you were

4   employed after you came here in 1968?  What was

5   your first job after you arrived?

6        A.     I worked as a dishwasher in

7   Chinatown.

8        Q.     How long --

9        A.     Throughout my college -- that four

10  years in college.

11       Q.     In what restaurant did you work?

12       A.     It's called Won Kee.

13       Q.     Do you know how to spell that?

14       A.     W-O-N, K-E-E.

15       Q.     And what were your hours of

16  employment at Won Kee?

17       A.     I worked there on Saturday and

18  Sunday.

19       Q.     And after you graduated college,

20  were you employed at any other jobs before

21  1979?

22       A.     Yes.  I worked in the accounting

23  firm.

24       Q.     In which firm was this?

25       A.     Called Frederick B. Wiepert.

1                        W. Tam

2        A.    I was engaged as the firm, as a CPA

3    firm, and I was also a shareholder.

4        Q.    Do you remember when it opened, what

5    year that was?

6        A.    Is that over there?  Is that the tax

7    return?

8        Q.    We have a certificate of

9    incorporation from I think it's October '84.

10   Does that refresh your recollection?

11       A.    I don't know.  It's too long for me

12   to remember.

13       Q.    Was the restaurant open before you

14   had a retainer with them or --

15       A.    Right in the beginning I have a

16   retainer with them.

17       Q.    What role, if any, did you have in

18   the opening of the restaurant, setting it up?

19       A.    Nothing.

20       Q.    You were a shareholder, is that

21   correct, at the opening?

22       A.    That's correct.

23       Q.    And did you purchase your shares?

24       A.    That's right.

25       Q.    And how many shares did you own?

Page 26

                              W. Tam

1

2      A.    Five.

3      Q.    Do you recall what the purchase

4   price was for those shares?

5      A.    50,000.

6      Q.    Was this an investment that you made

7   in anticipation of making money?

8           MR. McHUGH:  Objection to the form.

9   I will permit the witness to answer.

10     A.    Do you still want me to answer the

11  question?

12     Q.    I would.  Thank you.

13     A.    There is always a risk when you make

14  investment.  Am I correct?

15     Q.    That's a universal --

16     A.    You want to make money, of course,

17  but there is no assurance of that.  My life

18  experience told me that.  I am a very lousy

19  investor, believe me.

20          MR. McHUGH:  All right.

21     Q.    Your hope was that it would be a

22  wise decision and that you would make some

23  money; is that correct?

24     A.    That is American dream.

25          MR. KIMERLING:  Let me have this

1                             W. Tam

2        A.     That's correct.

3        Q.     And below that next to Yung Yam I

4    think it's Cheung, I can't read it, there is a

5    1 without a minus sign.

6        A.     Yes.

7        Q.     Does that indicate that Mr. Chan's

8    share, single share, was transferred to Yung

9    Yam?

10       A.     That's correct.

11       Q.     Under W. Tam, which I assume is you,

12   sir?

13       A.     That's correct.

14       Q.     There is a minus 5.  That indicates

15   that you sold your shares?

16       A.     That's correct.

17       Q.     When did you sell your shares?

18       A.     January 26th, 1996.

19       Q.     The person that appears to have

20   obtained your shares is Melina Tam.  Is she

21   related to you?

22       A.     Yes.

23       Q.     How is she related to you?

24       A.     She is my wife.

25       Q.     Did you sell your shares to her or

1                          W. Tam

2    Tom, the relationship of them is not going

3    well.  They thinking about divorce.  That put

4    me in a very awkward position.  That's why I

5    want to be out.

6        Q.    And why did that place you in an

7    awkward position?

8        A.    One is my cousin and one is, you

9    know --

10       Q.    Not your cousin?

11       A.    Yes.  That is very awkward, you

12   know.

13       Q.    Do you think it placed your wife in

14   an awkward position?

15            MR. McHUGH:  Objection to the form

16       of the question.  Calls for him to

17       speculate on the operation of someone

18       else's mind.

19            You can answer, if you wish.

20       A.    What is the question again?

21       Q.    Well, you said it put you in an

22   awkward position.

23       A.    Yes.

24       Q.    Why didn't it place your wife in the

25   same awkward position?

Page 34

W. Tam

1

2     A.     Because my wife is an inactive

3     investor.  She never come to the restaurant.

4     Q.     Did you or your wife ever obtain any

5     other shares in the restaurant after this

6     transfer in January of '96?

7     A.     There was two shares increased from

8     5 to 7, yes.

9     Q.     Was that through a transfer or

10    purchase by your wife?

11    A.     Yes.  You can see that on the column

12    next to me, Dung H. Leong, he want to be out,

13    so we were forced to buy all their shares.

14    Q.     And so when was that?

15    A.     I can't recall right now.  I can't

16    give you accurate answer on that.

17    Q.     Approximately, assuming that you

18    transferred your shares in January of '96, how

19    much later after that did Mr. Leong transfer

20    his shares?

21    MR. McHUGH:  Objection to the form.

22    Assumes it was later.

23    You can answer if you know.

24    A.     No, I can't recall.  It's too long

25    ago.

1                          W. Tam

2       Q.      Your counsel makes an interesting

3   time observation.  Was it before or after you

4   transferred your shares to your wife that

5   Mr. Leong transferred his shares?

6       A.      Before.

7       Q.      So your wife bought two shares at

8   some time before '96; is that correct?

9       A.      I recall I bought the shares, the

10  two shares, and then the shares were all

11  transferred to my wife on January 26th, 1996.

12      Q.      Do you recall how much you paid for

13  Mr. Leong's shares?

14      A.      Same thing, 10,000 a share.

15      Q.      I am going to ask you to look at the

16  names in the left-hand column of the

17  shareholders and indicate to me which of those

18  shareholders also were employed by the

19  restaurant.

20      A.      Peter T. Lee.

21      Q.      And what was his position at the

22  restaurant?

23      A.      General manager.  Right, Mr. Eng?

24      Q.      You could ask him later, but he is

25  not allowed to talk to you right now.

1                          W. Tam

2        Q.      Was he --

3        A.      He just sit there eating.

4        Q.      Okay.  Was he ever up as a host in

5    the front of the restaurant?

6        A.      No.

7        Q.      Did you ever see him serving tables?

8        A.      He didn't know how to do those

9    things.

10       Q.      You were his cousin.  What was he

11   doing during the time that -- was he employed

12   anywhere else during the time that the

13   restaurant was open?

14       A.      You mean since 1985?

15       Q.      1985, yes.

16       A.      No.  To my knowledge.  Okay?  To my

17   knowledge.

18       Q.      The next name is your wife's name.

19   Was she an employee in the restaurant at any

20   time?

21       A.      No.

22       Q.      Is there any other person on that

23   list whose name we haven't discussed who was an

24   employee?

25       A.      I think we covered everything, yes,

1                          W. Tam

2     Mr. Tom the president of the corporation?

3          A.    From the beginning to sometime in

4     the '90s.

5          Q.    And after he was no longer

6     president, who was the president?

7          A.    Mee Mee Tom.

8          Q.    Did he hold any other officer

9     positions after his wife took over as

10    president?

11         A.    You mean in Nice Restaurant?

12         Q.    Yes.

13         A.    No.  As far as I know, no.

14         Q.    Did there come a time when your wife

15    transferred her shares to the restaurant?

16         A.    Excuse me?  I didn't follow your

17    question.

18         Q.    Did your wife ever sell or transfer

19    her shares, the seven shares that she owned in

20    the restaurant?

21         A.    Yes.

22         Q.    Do you remember when that was?

23         A.    That was in 2005.

24         Q.    Were they sold for compensation?

25         A.    Yes.

1                           W. Tam

2        Q.     Did you attend these meetings?

3        A.     Sometimes they invite me.

4        Q.     Let's talk about that for a minute.

5    At some point in time you were the secretary of

6    the board; is that correct?

7        A.     That's correct.

8        Q.     And you resigned in '95, '96?  When

9    did you resign the position as secretary of the

10   board?

11       A.     July 1st, 1996.

12       Q.     When you transferred your shares; is

13   that correct?

14       A.     I transferred the shares on January

15   26th.

16       Q.     So July 1st, 1996 you resigned?

17       A.     That's correct.

18       Q.     Why did you resign as secretary in

19   July of '96?

20       A.     I don't feel comfortable with the

21   way Mee Mee Tom run the restaurant.

22       Q.     What, in particular, made you

23   uncomfortable?

24       A.     Because Mee Mee Tom and Ben Tom did

25   not get along, as I told you, put me in a very

1                           W. Tam

2     awkward position.

3         Q.    I understand their relationship to

4     each other was difficult, but you said you

5     didn't feel comfortable the way that she ran

6     the restaurant.  What was it in the way that

7     she ran the restaurant that made you

8     uncomfortable?

9         A.    Well, Ben Tom is my cousin.  I trust

10    him.  Mee Mee Tom is not my cousin.  I am not

11    in the office.  I am not in the restaurant.

12    Most of -- almost 99 percent of the time I am

13    not in the restaurant.

14        Q.    Did you have reason not to trust

15    her?  Is there something that she did that led

16    you not to trust her?

17        A.    No.  Just my intuitive feeling.

18    That's my feeling.

19            MR. KIMERLING:  Why don't we just

20        take a short break.

21            (Recess was taken from 11:18 to

22        11:31.)

23    BY MR. KIMERLING:

24        Q.    You testified -- this is just to

25    refresh both our recollections -- at some point

Page 52

1                              W. Tam

2      in '96 when Mrs. Tom became the president you

3      withdrew as the secretary of the board; is that

4      correct?

5          A.    Yes.

6          Q.    And you also indicated that you felt

7      comfortable with Mr. Tom's running the

8      restaurant, but not with Mee Mee Tom; is that

9      correct?

10         A.    That's correct.

11         Q.    And that in Mr. Tom's era as the

12     president he was the person who you saw as the

13     accountant or board member as running the

14     restaurant; is that correct?

15         A.    No.

16         Q.    Who ran the restaurant during the

17     period when Mr. Tom was president?

18         A.    Peter Lee.

19         Q.    And Peter Lee was the general

20     manager?

21         A.    That's correct.

22         Q.    Who hired Mr. Lee?

23         A.    I don't know.  He is the one -- he

24     was the one who planned the whole thing.

25         Q.    Mr. Lee?

Page 54

1                          W. Tam

2        A.    Yes.

3        Q.    And after '96 did you attend any

4   board meetings of the restaurant?

5        A.    I attend the meeting as the

6   accountant function, as the role of accountant.

7        Q.    And how often did you attend

8   meetings after '96?

9        A.    Once a year, the most.  I can't give

10  you exact.  Average maybe once a year.

11       Q.    Were you in any other meetings at

12  the restaurant other than those once-a-year

13  meetings?

14       A.    No.

15       Q.    You indicated that you kept the

16  corporate book after you resigned as secretary;

17  is that correct?

18       A.    As a matter of convenience, yes.

19       Q.    Convenience?

20       A.    Yes, as a matter of convenience for

21  the client.

22             MR. KIMERLING:  Let me have this

23       marked as Plaintiffs' Exhibit 3 in the

24       William Tam deposition.

25             (Plaintiffs' Exhibit 3, letter dated

1                          W. Tam

2           December 28, 1985, Bates stamped OT 201,

3           marked for identification.)

4           Q.    I show you what's been marked as

5     Plaintiffs' Exhibit 3.  Do you recognize that

6     document, Mr. Tam?

7           A.    Pardon?

8           Q.    Do you recognize this document?

9           A.    Yes.

10          Q.    This is your letter of engagement

11    with Nice Restaurant; is that correct?

12          A.    That's correct.

13          Q.    It's addressed to Mr. Tom as the

14    president; is that correct?

15          A.    Yes.

16          Q.    It's dated, I believe, December

17    28th, 1985?

18          A.    That's correct.

19          Q.    Were you providing accounting

20    services prior to this date?

21          A.    Yes.

22          Q.    Let me draw your attention to --

23    there is a line after the numbered sentences.

24    That sentence reads:  "Our engagement cannot be

25    relied upon to disclose errors, irregularities

Page 58

1                              W. Tam

2     2005, that five-year period, how often were you

3     in the restaurant?

4          A.    That's very difficult to tell.   How

5     can I remember something -- it's not fair to

6     ask this question.

7          Q.    I understand it's a difficult

8     question, but were you in the restaurant on the

9     average of once a month during this period?

10         A.    I would say about twice a month.

11         Q.    What was the reason that you would

12    come to the restaurant during this period from

13    2000 to 2005?

14              MR. McHUGH:   Object to the form of

15         the question.  You said "reason."  There

16         may be different reasons for each visit.

17              MR. KIMERLING:   That's correct.

18         A.    Mostly I came over there to pick up

19    the mail that was reserved for me, tax mail,

20    you know.

21         Q.    Did you pick up any records from the

22    restaurant during these visits?

23         A.    Yes.

24         Q.    What kinds of records did you pick

25    up?

1                        W. Tam

2       A.      The daily sales report.

3       Q.      Anything else?

4       A.      Bank statement.

5       Q.      Anything else?

6       A.      That's it.

7       Q.      Did you pick up any payroll

8  information during these approximately

9  twice-a-month visits?

10      A.      Yes.

11      Q.      You picked up payroll information;

12  is that correct?

13      A.      Yes.

14      Q.      What specifically was the payroll

15  information that you picked up.

16      A.      The Social Security number of the

17  new employee, when they start to work.

18      Q.      Anything else?

19      A.      Something like that.  That's all.

20      Q.      Did you pick up any information

21  about the hours of the employees' work at that

22  time?

23      A.      No.

24      Q.      Did you maintain the employee files

25  of the restaurant at any time between 2000 and

Page 60

                              W. Tam

2  2005?

3      A.    Can you be more specific on that.

4      Q.    Let me ask it a different way.  Did

5  the restaurant have any files that it

6  maintained for each employee, forms or anything

7  else?

8      A.    There is a file for I-9.  There is a

9  folder for W-4.  That's all I know.

10     Q.    Those were files that the restaurant

11 maintained?

12     A.    That's correct.

13     Q.    Did you maintain parallel files in

14 your office?

15     A.    No.

16     Q.    These approximately twice-a-month

17 visits that you made, how long a time were you

18 in the restaurant during these visits?

19     A.    Very brief.

20     Q.    Fifteen minutes?

21     A.    You are right in the ballpark.

22     Q.    In the period from 2000 to 2005 who,

23 if anyone, would you talk to in the restaurant

24 when you visited?

25          MR. McHUGH:  I am going to object to

1                           W. Tam

2           that question as overly broad.

3                   MR. KIMERLING:  It is.  I will

4           rephrase it.  Thank you.

5           Q.    Other than saying hello to a waiter,

6     is there some person or persons that you would

7     regularly talk to when you came to the

8     restaurant?

9           A.    No.

10          Q.    Who was the person that provided you

11    with the documents that you took back from the

12    restaurant?  Was there somebody that kept those

13    for you?

14          A.    Mee Mee Tom, I guess.

15          Q.    So did you speak to Miss Tom,

16    Mrs. Tom, to get your daily sales receipts,

17    et cetera, that you took back with you to your

18    office?

19          A.    The bookkeeper prepared the daily

20    sales report and was put in the folder.

21          Q.    And who, if anyone, would provide

22    you with information about new employees?

23          A.    Mee Mee Tom.

24          Q.    You were on this retainer engagement

25    letter until the end of 2005; is that correct?

Page 63

W. Tam

1

2    Q.    Do you know where she was residing

3    in 2006?

4    A.    I don't know.  I never -- I don't

5    know.

6    Q.    When you ended your services as an

7    accountant in the end of '05 or the beginning

8    of '06 at the completion of the taxes, did you

9    transfer any documents back to the restaurant?

10    A.    Yes.

11    Q.    Which ones were they?

12    A.    All the payroll folder, all the

13    payroll journal, all the payroll reports, all

14    the payroll individual records of three years;

15    '05, '04, '03.

16    Q.    And you provided them to whom at the

17    restaurant?

18    A.    I put it in the box and give it to

19    Mee Mee Tom.

20    Q.    Do you still maintain copies of

21    corporate tax returns in your office for this

22    restaurant?

23    A.    No.  I gave it to Mee Mee Tom.

24    Q.    Besides the payroll information, you

25    also gave her back the corporate tax return?

Page 68

W. Tam

1

2      A.     I don't make up those checks.  I

3  don't make copies of that.  It's all in the

4  bank statement, the check, and, I'm sorry, I

5  really don't remember whether I still have the

6  bank statement or I returned back to Mee Mee

7  Tom.  I apologize for that.

8      Q.     No, listen, your attorney and you

9  can talk about it and if you have them, we may

10  obtain it at some point.

11      A.     Absolutely.

12      Q.     Did you have any authority to sign

13  checks for the corporation at any time?

14      A.     The first three or four years.

15      Q.     And after that you no longer had the

16  authority; is that correct?

17      A.     That's correct.

18      Q.     Who had the authority to sign checks

19  for the corporation?

20      A.     Can you tell me the period?

21      Q.     Sure.  From the beginning, when the

22  restaurant first opened, who had the authority

23  to sign checks?

24      A.     Ben Tom.

25      Q.     Did he continue to have that

W. Tam

1

2      Q.    And what is -- is it use?

3      A.    Used tax.  There is the sales tax,

4  there is the used tax.  Sales and used tax.

5      Q.    I apologize for my unfamiliarity.

6  What is used tax?

7      A.    Used tax is you purchase something,

8  you have to pay the used tax.

9      Q.    Okay.  In other words, give me an

10  example.  It may be helpful to understand.

11      A.    I believe there is a bill from the

12  garbage collection, there is no sales tax paid

13  on that, no used tax paid on that, and they

14  find there and they charge on that.

15      Q.    There wasn't a controversy about the

16  sales taxes of the restaurant?

17      A.    No.

18      Q.    During the period that Mr. Tom was

19  an employee in 2001, do you recall what his

20  position in the restaurant was?

21      A.    I don't know.

22      Q.    You indicated earlier that one of

23  your functions was the calculation of payroll

24  for the restaurant; is that correct?

25      A.    To do the payroll, yes.

Page 73

W. Tam

1

2    Q.    What information did you use in

3    preparing the payroll?

4    A.    Mee Mee Tom gave me who will be on

5    the payroll for that particular period, number

6    of hours, wages.

7    Q.    How did she provide you that

8    information, was it orally or --

9    A.    Orally.

10    Q.    So she would indicate to you who

11    should be on the payroll for particular time

12    frames; is that correct?

13    A.    We did it by exception.  She told me

14    whoever is not in the payroll.

15    Q.    I see.

16    A.    It will be easier.

17    Q.    And so there are points in time when

18    people were removed from the payroll; is that

19    correct?

20    A.    I guess so, yes.

21    Q.    She also told you the number of

22    hours that those that were on the payroll

23    worked; is that correct?

24    A.    That's correct.

25    Q.    Did she give that to you in writing

Page 74

1                      W. Tam

2    or orally?

3        A.    Orally.

4        Q.    Did you ever ask her for

5    documentation in regard to the hours of the

6    employees?

7        A.    That's not my job.

8        Q.    She told you their wages; is that

9    correct?

10       A.    She told me the hours, she told me

11   the wage.

12       Q.    And when you say "the wage," is that

13   their hourly wage or their biweekly --

14       A.    Hourly rate.

15       Q.    Did she orally provide that

16   information to you or was it in writing?

17       A.    Orally.

18       Q.    And did you do this in person or

19   over the phone with her?

20       A.    On the phone.

21           MR. KIMERLING:  Can I have this

22   marked as Plaintiffs' Exhibit 4.

23           (Plaintiffs' Exhibit 4 letter dated

24   April 30, 1996, Bates stamped OT 176

25   through OT 179, marked for identification.)

Page 79

1                              W. Tam

2          A.    I did not.

3          Q.    Did you ever tell anybody not to

4     install a time clock?

5          A.    I did not.

6          Q.    At any time that you were at the

7     restaurant did you ever see a sign-in book or

8     sign-in log of any kind that was maintained by

9     the restaurant?

10         A.    In that fifteen minutes I did not

11    see it.

12               MR. KIMERLING:  Mark this as

13         Exhibit 5, please, in the William Tam

14         deposition.

15               (Plaintiffs' Exhibit 5, copies of

16         checks, Bates stamped OT 325 through

17         OT 328, marked for identification.)

18         Q.    Would you take a look at that

19    exhibit, sir.

20         A.    Yes.

21         Q.    These are copies of checks that your

22    attorneys have provided me.

23         A.    Okay.

24         Q.    Do you recognize these checks?

25         A.    These are the checks signed by Mee

1                           W. Tam

2    Mee Tom.

3        Q.    And who prepared the check itself?

4        A.    This is Mee Mee Tom's handwriting.

5        Q.    Have you ever seen these checks

6    before you turned them over to your attorney?

7        A.    I saw that when I prepared my

8    records.

9        Q.    Were the employees at the restaurant

10   paid in cash --

11       A.    Yes.

12       Q.    -- for their work?

13       A.    Yes.

14       Q.    Were they paid in cash and check or

15   just cash?

16       A.    99 percent paid in cash.

17       Q.    Some workers were paid in check?

18       A.    Some they specifically requested to

19   be paid in check and we paid them in check, and

20   Mee Mee Tom paid in check.

21       Q.    Looking at the first page of this

22   exhibit, 325 Bates stamp, you will see that

23   there are two checks made out to cash which say

24   for the August 15th payroll.  Do you see that?

25       A.    Yes.

1                              W. Tam

2       in check and how much was in cash?  Who would

3       divide it up?

4              A.    If the employee requested to be paid

5       in check, let's say there is only one, let's

6       say the total payroll is 12,300, let's say the

7       employee check is 300, I would put down 300 and

8       12,000.

9              Q.    Okay.  And who prepared the checks

10      for the employees that requested it?

11             A.    Mee Mee Tom.

12             Q.    Did you ever obtain copies of those

13      checks when you obtained the bank statements

14      from the restaurant?

15             A.    I saw that, yes.

16             Q.    Do you know whether or not those

17      checks had a stub, pay stub that broke out the

18      withholding or the hourly wages or any other

19      information about the check?

20             A.    Yes.

21             Q.    And who prepared that?

22             A.    I.  As part of the payroll journal

23      they create a loose sheet of paper, you know.

24             Q.    And you would prepare that and give

25      it to --

Page 86

                        W. Tam

1

2       A.      To Mee Mee Tom.

3       Q.      Would she pass that out with the

4   cash as well?

5       A.      I don't know.

6       Q.      But you gave her a slip for each

7   employee?

8       A.      Yes.

9               MR. KIMERLING:  Let me have this

10          marked as Plaintiffs' Exhibit 6, please.

11              (Plaintiffs' Exhibit 6, Nice

12          Restaurant Inc. 4th QTR 2001 spread sheet,

13          Bates stamped OT 709, OT 710, OT 399 and

14          OT 400, marked for identification.)

15      Q.      I show you what's been marked as

16  Plaintiffs' Exhibit 6.  It is a combination of

17  pages from the production that your attorneys

18  have provided me.  They are Bates stamped 709

19  and 710 and 399 and 400.

20              MR. KIMERLING:  We will all agree

21          that although these documents have Social

22          Security numbers on them, that if they are

23          shown to anyone else, the information will

24          be redacted.  Is that an agreement,

25          counsel?

1                           W. Tam

2          Q.     Okay.  Do you know whose handwriting

3     that would be?

4          A.     This is -- no, I don't know.

5          Q.     Is there someone in your office that

6     assisted you in the handling of the account of

7     Nice Restaurant?

8          A.     No.  I do it myself.

9          Q.     Let me ask you to look at

10    Plaintiffs' Exhibit 7 again, document 985, the

11    next page.  Do you see that chart there?

12         A.     Yes.

13         Q.     Do you know who prepared that chart?

14         A.     That I prepared.

15         Q.     Could you tell me what the second

16    column of numbers refers to?

17         A.     That represent the shares of the

18    tips based on what Mee Mee Tom told me.

19         Q.     And the next column is what

20    information?

21         A.     That is basically the percentage of,

22    let's say, 1 divided by 12.60 equal to 0.079.

23         Q.     And the figure 5,000 --

24         A.     Is the amount of the tips for that

25    period.

1                           W. Tam

2        Q.     Who provided you that number?

3        A.     Mee Mee Tom.

4        Q.     Did you ask her to provide you any

5   other documents to support --

6        A.     No.

7        Q.     -- that number?

8        A.     No.

9        Q.     Do you have reason to believe that

10   for the pay period from January 1st to the 15th

11   that only $5,000 exactly was obtained in tips?

12        A.     My role is just ADP.  I take

13   whatever they gave me.

14        Q.     You don't have an obligation as an

15   accountant to question the reliability or the

16   accuracy of that number?

17             MR. McHUGH:  Objection to the form.

18        Calls for a conclusion of law.

19             You can answer, if you know.

20        A.     I do not -- as I say in engagement

21   letter, I prepare everything according to what

22   they told me to do.  That is spelled out in the

23   engagement letter.

24        Q.     But you also indicated that you

25   wouldn't as an accountant prepare or file a

1                          W. Tam

2              MR. KIMERLING:  Let me just take a

3        second here for a second.

4              (Discussion off the record.)

5    BY MR. KIMERLING:

6        Q.    You obtained information from the

7    restaurant for the tips that the waiters --

8    whoever were on these lists; is that correct?

9        A.    Mee Mee Tom told me the amount of

10   tips for each period.

11       Q.    And you then added that in to your

12   payroll records; is that correct?

13       A.    That's correct.

14       Q.    Did you make any determinations as

15   to whether or not the amount of tips

16   corresponded with gross sales information that

17   the restaurant provided you?

18       A.    I did -- once a year I filed a form

19   to the IRS.  It fall into the guideline of

20   about 8 to 9 percent.

21       Q.    So for the purposes of that form you

22   would calculate it to ensure that it fell

23   within that 8 percent guideline; is that

24   correct?

25       A.    The form require me to calculate it.

Page 110

1                         W. Tam

2    that?

3         A.    Six times 91 equal to 546.

4         Q.    And then there is a thing that says

5    "OT."

6         A.    Yes.

7         Q.    What does that refer to?

8         A.    Refer to the overtime.

9         Q.    Is that a number of hours or a

10   number --

11        A.    Four hours.

12        Q.    Excuse me?

13        A.    Four hours.

14        Q.    Four hours of overtime?

15        A.    Yes.

16        Q.    I see a number 12.

17        A.    That is the dollar amount, $12.

18        Q.    Okay.  And how did you calculate

19   that?

20        A.    Based on the guideline provided by

21   the Federal Department of Labor.

22        Q.    And that would have been $3 an hour

23   for four hours; is that correct?

24        A.    That is one and half hour -- one and

25   half pay.  3 times 4 is 12.

1                              W. Tam

2          get a re-assessment.

3              MR. KIMERLING:  I have a series of

4          questions which I think won't take long

5          based on what I know of your client's

6          opinion or belief.

7          Q.    My question, Mr. Tam is what role,

8      if any, did you play in the hiring of any of

9      the managers of the restaurant?

10         A.    No role at all.

11         Q.    Were you at all consulted by any of

12     the personnel at the restaurant in regard to

13     the hiring of managers?

14         A.    No.

15         Q.    Did you have a role in the hiring of

16     any employees in the restaurant?

17         A.    No.

18         Q.    Do you have any role in anyone being

19     fired from the restaurant?

20         A.    No.

21         Q.    Did you ever discuss with anyone at

22     the restaurant the need to terminate

23     undocumented workers from the restaurant?

24             MR. McHUGH:  This is ever during the

25         twenty years?

Page 126

W. Tam

2    terminate a worker named Li, L-I, Zhe, Z-H-E,

3    Fei, F-E-I?  These are phonetical.

4         A.    I don't recall.  I don't even know

5    the name.  I don't.

6         Q.    You don't recall that worker?

7         A.    I don't recall.

8         Q.    Did you have any role in setting the

9    hourly wages of the employees in the

10   restaurant?

11        A.    No.

12        Q.    Did you have any discussions with

13   anybody in the restaurant about the hourly

14   wages that were being paid to the workers?

15        A.    Say again.

16        Q.    Did you have any discussion with

17   anyone in the restaurant about the hourly wages

18   that were being paid to the workers other than

19   when Miss Tom or someone else at the restaurant

20   told you about it?

21        A.    No.

22        Q.    You never said to them that's the

23   minimum wage or that's not the minimum wage?

24        A.    No.

25        Q.    Did you have any discussion with

1

2                        C E R T I F I C A T E

3

4     STATE OF NEW YORK     )

5                             ) ss.:

6     COUNTY OF NASSAU       )

7

8            I, KRISTIN KOCH, a Notary Public within

9     and for the State of New York, do hereby

10    certify:

11           That WILLIAM TAM, the witness whose

12    deposition is hereinbefore set forth, was

13    duly sworn by me and that such deposition

14    is a true record of the testimony given by

15    such witness.

16           I further certify that I am not

17    related to any of the parties to this

18    action by blood or marriage; and that I am

19    in no way interested in the outcome of this

20    matter.

21           IN WITNESS WHEREOF, I have hereunto

22    set my hand this 7th day of March,

23    2008.

24           _____

25           KRISTIN KOCH, RPR, RMR, CRR, CLR