**EXHIBIT 2**

```
                                                            Page 1
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4
    GAN H. ENG, TAN F. LAM,          )
 5  KWOK C. TANG, JUN Q. CHAN,       )
    KAM C. HO, XIAO Z. ZHANG,        ) 07 Civ 3909
 6  YAT C. CHAN, MING HO, RONG J.    )
    CHEN, JIAN Z. LUO, LE Y. CHEN,   )
 7  JIAN B. YAN, SU C. JIANG,        )
    XIU H. JIANG, XIU LIN, TAK S.    )
 8  CHENG, SHU C. HUANG, MEI J.      )
    HUANG and OY K. KWAN,            )
 9                                   )
                  Plaintiffs,        )
10                                   )
              vs.                    )
11                                   )
    THE NICE RESTAURANT, INC.,       )
12  BEN H. TOM, MEE MEE TOM a.k.a.   )
    MEE MEE M. THOM a.k.a. MEE MEE   )
13  MEI, YAN SHING CHAN, CHEUNG      )
    YONG, SHING SI SUN, SHEN PING    )
14  CHU, JOHN TAM, SI KIT WU,        )
    SI HUNG WU, CHUI BAI TAM, and    )
15  JIMMY MOY a.k.a. JIMMY MUI       )
    a.k.a. JIMMY MEI,                )
16                                   )
                  Defendants.        )
17  --------------------------------)
18
19            DEPOSITION OF WILLIAM TAM
20                 New York, New York
21             Tuesday, February 26, 2008
22
23
24  Reported by:
    KRISTIN KOCH, RPR, RMR, CRR, CLR
25  JOB NO. 15170
```

Page 46

```
1              W. Tam
2    A.  On the tax return -- you mean -- say
3  again the question.
4    Q.  Did the restaurant corporation ever
5  distribute any of its profits to its
6  shareholders?
7    A.  No.
8    Q.  Did it make any distribution of its
9  income to its shareholders?
10   A.  No.
11   Q.  Did you ever distribute any funds to
12 Ben Tom other than the one quarter that he was
13 an employee?
14   A.  No.
15   Q.  Were you the holder of the corporate
16 records for the restaurant?
17       MR. McHUGH:  Please clarify during
18   which period, if you could.
19   Q.  At any point in time were you the
20 holder of the records of the corporation?
21       MR. McHUGH:  When you say "records
22   of the corporation," what are you talking
23   about?
24       MR. KIMERLING:  I'm sorry.  Thank
25   you.
```
TSG Reporting - Worldwide    (877) 702-9580

Page 47

```
1              W. Tam
2    Q.  Were you the holder of the share
3  books of the shareholders?
4    A.  Well, common practice is that
5  usually they leave the stock book in the
6  accountant's office.
7    Q.  So I take that to mean that you did
8  have the stock book in your office?
9    A.  I did have the possession for a
10 certain period.
11   Q.  Did you also possess the corporate
12 seal?
13   A.  That is also as a common practice,
14 put it -- I have the whole folder, so the
15 public seal, of course, is there too.
16   Q.  And you say for a certain period of
17 time.  For what period of time did you hold the
18 stock book and the seal?
19   A.  When I surrendered the share -- when
20 I transferred the share to my wife.
21   Q.  That was the end of it?
22   A.  Yes.
23   Q.  1996?
24   A.  That's correct.
25   Q.  So you didn't have the stock book
```
TSG Reporting - Worldwide    (877) 702-9580

Page 48

```
1              W. Tam
2  after 1996; is that correct?
3    A.  Mee Mee Tom has it.
4    Q.  After 1996?
5    A.  That's correct.
6    Q.  Did you possess the seal after 1996?
7    A.  I believe I have the seal.  The
8  corporate book, yes.
9    Q.  I'm sorry?
10   A.  I have the corporate book, because
11 the corporate book is still in my office.
12   Q.  And what do you mean by the
13 corporate book?
14   A.  The book, the black binder.
15   Q.  Well, I apologize, but unlike some
16 of the other lawyers here I don't represent
17 corporations.  What is in the black binder?
18   A.  You have -- it's a thick binder.
19 You have the certificate of incorporation there
20 and then you have some minutes, some pages over
21 there.
22   Q.  But the share book was transferred
23 to Mee Mee Tom?
24   A.  That's correct.
25   Q.  And in the corporate book are there
```
TSG Reporting - Worldwide    (877) 702-9580

Page 49

```
1              W. Tam
2  any minutes of the corporation that you still
3  maintain?
4    A.  I don't have anything right now.
5    Q.  But you still have the corporate
6  book in your office currently?
7    A.  No, no more.
8    Q.  What happened to the corporate
9  books?
10   A.  When my wife sold the shares, I gave
11 everything back to Mee Mee Tom.
12   Q.  When was the last time you had
13 contact with Mee Mee Tom?
14   A.  The day -- December 31st, 2005.
15 Around that date.
16   Q.  And you haven't seen her since then?
17   A.  You are correct.
18   Q.  Do you have any knowledge about
19 where she is presently living?
20   A.  No.
21   Q.  Did the corporation have any
22 meetings of its board or shareholders during
23 the time that you or your wife were
24 shareholders?
25   A.  Yes.
```
TSG Reporting - Worldwide    (877) 702-9580

## Page 50

W. Tam

Q. Did you attend these meetings?
A. Sometimes they invite me.
Q. Let's talk about that for a minute. At some point in time you were the secretary of the board; is that correct?
A. That's correct.
Q. And you resigned in '95, '96? When did you resign the position as secretary of the board?
A. July 1st, 1996.
Q. When you transferred your shares; is that correct?
A. I transferred the shares on January 26th.
Q. So July 1st, 1996 you resigned?
A. That's correct.
Q. Why did you resign as secretary in July of '96?
A. I don't feel comfortable with the way Mee Mee Tom run the restaurant.
Q. What, in particular, made you uncomfortable?
A. Because Mee Mee Tom and Ben Tom did not get along, as I told you, put me in a very

## Page 51

W. Tam

awkward position.
Q. I understand their relationship to each other was difficult, but you said you didn't feel comfortable the way that she ran the restaurant. What was it in the way that she ran the restaurant that made you uncomfortable?
A. Well, Ben Tom is my cousin. I trust him. Mee Mee Tom is not my cousin. I am not in the office. I am not in the restaurant. Most of -- almost 99 percent of the time I am not in the restaurant.
Q. Did you have reason not to trust her? Is there something that she did that led you not to trust her?
A. No. Just my intuitive feeling. That's my feeling.
    MR. KIMERLING: Why don't we just take a short break.
    (Recess was taken from 11:18 to 11:31.)
BY MR. KIMERLING:
Q. You testified -- this is just to refresh both our recollections -- at some point

## Page 52

W. Tam

in '96 when Mrs. Tom became the president you withdrew as the secretary of the board; is that correct?
A. Yes.
Q. And you also indicated that you felt comfortable with Mr. Tom's running the restaurant, but not with Mee Mee Tom; is that correct?
A. That's correct.
Q. And that in Mr. Tom's era as the president he was the person who you saw as the accountant or board member as running the restaurant; is that correct?
A. No.
Q. Who ran the restaurant during the period when Mr. Tom was president?
A. Peter Lee.
Q. And Peter Lee was the general manager?
A. That's correct.
Q. Who hired Mr. Lee?
A. I don't know. He is the one -- he was the one who planned the whole thing.
Q. Mr. Lee?

## Page 53

W. Tam

A. Mr. Lee.
Q. And how do you know that, that Mr. Lee planned the whole thing?
A. I heard them talking about it.
Q. And by "they," who do you refer to? Who do you refer to when you said you heard them talking about it?
A. The shareholders.
Q. Now, during the period that you were the secretary, did you regularly attend board meetings of the shareholders?
A. No.
Q. Did you attend any meetings of the shareholders while you were the --
A. Once in a while they invite me.
Q. How often is once in a while?
A. A couple of times a year.
Q. And where were those meetings held?
A. In Nice Restaurant.
Q. Prior to '96, was Mr. Tom at those meetings?
A. Yes.
Q. Was his wife, Mee Mee, at those meetings?

TSG Reporting - Worldwide    (877) 702-9580

Page 34

W. Tam

2  A.  Because my wife is an inactive
3  investor. She never come to the restaurant.
4  Q.  Did you or your wife ever obtain any
5  other shares in the restaurant after this
6  transfer in January of '96?
7  A.  There was two shares increased from
8  5 to 7, yes.
9  Q.  Was that through a transfer or
10 purchase by your wife?
11 A.  Yes. You can see that on the column
12 next to me, Dung H. Leong, he want to be out,
13 so we were forced to buy all their shares.
14 Q.  And so when was that?
15 A.  I can't recall right now. I can't
16 give you accurate answer on that.
17 Q.  Approximately, assuming that you
18 transferred your shares in January of '96, how
19 much later after that did Mr. Leong transfer
20 his shares?
21     MR. McHUGH: Objection to the form.
22 Assumes it was later.
23     You can answer if you know.
24 A.  No, I can't recall. It's too long
25 ago.

TSG Reporting - Worldwide   (877) 702-9580

Page 35

W. Tam

2  Q.  Your counsel makes an interesting
3  time observation. Was it before or after you
4  transferred your shares to your wife that
5  Mr. Leong transferred his shares?
6  A.  Before.
7  Q.  So your wife bought two shares at
8  some time before '96; is that correct?
9  A.  I recall I bought the shares, the
10 two shares, and then the shares were all
11 transferred to my wife on January 26th, 1996.
12 Q.  Do you recall how much you paid for
13 Mr. Leong's shares?
14 A.  Same thing, 10,000 a share.
15 Q.  I am going to ask you to look at the
16 names in the left-hand column of the
17 shareholders and indicate to me which of those
18 shareholders also were employed by the
19 restaurant.
20 A.  Peter T. Lee.
21 Q.  And what was his position at the
22 restaurant?
23 A.  General manager. Right, Mr. Eng?
24 Q.  You could ask him later, but he is
25 not allowed to talk to you right now.

TSG Reporting - Worldwide   (877) 702-9580

Page 36

W. Tam

2  A.  I have to go on?
3  Q.  Yes. Thank you.
4  A.  Peter M. Chan.
5  Q.  What was Mr. Chan's position in the
6  restaurant?
7  A.  He is the captain.
8  Q.  That's your name. And then after
9  your name?
10 A.  Choi Wah.
11 Q.  Was he an employee of the
12 restaurant?
13 A.  He is the captain. Wu, Sze Kit.
14 Q.  What was Mr. Kit's position in the
15 restaurant?
16 A.  He is the chef.
17 Q.  Is that Damon Lee, was he an
18 employee as well?
19 A.  No. Wu Sze Kit. To Ha Lam.
20 Q.  Is that a man or a woman?
21 A.  It is a man.
22 Q.  And Mr. Lam, what was his position
23 at the restaurant?
24 A.  Who, To Ha Lam?
25 Q.  Yes.

TSG Reporting - Worldwide   (877) 702-9580

Page 37

W. Tam

2  A.  He is also a chef also. Chan, Yan
3  Shing.
4  Q.  Okay. He is the person we
5  identified previously as a defendant? Is that
6  the same person?
7  A.  Yes.
8  Q.  What was his position in the
9  restaurant?
10 A.  He is a manager. And then Mee Mee
11 Tom.
12 Q.  What was her position in the
13 restaurant?
14 A.  Mee Mee Tom?
15 Q.  Yes.
16 A.  Is a manager.
17 Q.  Mr. Kit you have already identified.
18 A.  Yes. Wu Shi Xiong. He is a cook.
19 Q.  Okay. Anyone else on this?
20 A.  King Pue Hui, he is a cook. Yung
21 Yam Cheng is a dim sum chef. Wong Wai is a
22 manager, he is captain. Shall I go on?
23 Q.  Yes, please.
24 A.  And then we skip the next one. And
25 then after one the next one is Sun Sheng Xian.

TSG Reporting - Worldwide   (877) 702-9580

Page 74

```
1         W. Tam
2  or orally?
3     A.   Orally.
4     Q.   Did you ever ask her for
5  documentation in regard to the hours of the
6  employees?
7     A.   That's not my job.
8     Q.   She told you their wages; is that
9  correct?
10    A.   She told me the hours, she told me
11 the wage.
12    Q.   And when you say "the wage," is that
13 their hourly wage or their biweekly --
14    A.   Hourly rate.
15    Q.   Did she orally provide that
16 information to you or was it in writing?
17    A.   Orally.
18    Q.   And did you do this in person or
19 over the phone with her?
20    A.   On the phone.
21         MR. KIMERLING: Can I have this
22    marked as Plaintiffs' Exhibit 4.
23         (Plaintiffs' Exhibit 4 letter dated
24    April 30, 1996, Bates stamped OT 176
25    through OT 179, marked for identification.)
   TSG Reporting - Worldwide   (877) 702-9580
```

Page 75

```
1         W. Tam
2     Q.   I show you what's been marked as
3  Plaintiffs' Exhibit 4. Do you recognize these
4  documents?
5     A.   Yes.
6     Q.   Can you tell me what they are?
7     A.   They are called a Summary of Unpaid
8  Wages.
9     Q.   There are several letters in this,
10 one of which is addressed to you; is that
11 correct?
12    A.   Which one? The last one. Okay.
13 I'm sorry.
14    Q.   And I believe the one on the top,
15 the first one.
16    A.   Oh, okay.
17    Q.   For the record, these are Bates
18 stamped 176 through 179. They were produced by
19 Defendant Tam.
20         What was your involvement in this
21 matter with the Department of Labor?
22    A.   I represent my client.
23    Q.   And what was at issue here?
24    A.   There is an audit.
25    Q.   And the audit was conducted by the
   TSG Reporting - Worldwide   (877) 702-9580
```

Page 76

```
1         W. Tam
2  Department of Labor?
3     A.   Right on the letter, U.S. Department
4  of Labor.
5     Q.   There was a determination that there
6  was a non-payment of overtime; is that correct?
7     A.   That's correct.
8     Q.   What information, if any, did you
9  provide to the Department of Labor, did you,
10 yourself, provide to the Department of Labor?
11    A.   The payroll journal, individual
12 payroll record. Whatever they ask.
13    Q.   I show you what was marked as Bates
14 stamp 356. Is this a page of the journal that
15 you referred to?
16    A.   Yes, this is a payroll journal, yes.
17    Q.   And do you still have copies of that
18 journal other than the ones you provided to me
19 or to your attorney?
20    A.   I have the '01 and '02. As I told
21 you before, I gave back '03, '04, '05 to
22 Mrs. Tom.
23    Q.   That's correct, I forgot. I
24 apologize.
25         Did you speak to Mr. Tom or anyone
   TSG Reporting - Worldwide   (877) 702-9580
```

Page 77

```
1         W. Tam
2  else at the restaurant about this audit and the
3  outcome of the audit?
4     A.   Yes.
5     Q.   Who did you speak to?
6     A.   I cannot recollect right now.
7     Q.   Do you recall what, if anything, you
8  may have said to representatives of the
9  restaurant?
10    A.   This is almost twelve years ago.
11    Q.   I understand.
12    A.   I can't remember what I said.
13    Q.   Okay. Did you talk to anyone at the
14 restaurant about record keeping requirements
15 that are in the letter to you on the last page
16 of this exhibit, Bates stamp 179?
17    A.   I don't recall.
18    Q.   I note that -- and my copy of this
19 last page is fairly faint, but there is a
20 handwritten check in that letter before the
21 line "time of day and day of week on which
22 employees' workweek begins," that's 5, and
23 number 6, "regularly hourly rate."
24    A.   Uh-huh.
25    Q.   Do you recall whether you made those
   TSG Reporting - Worldwide   (877) 702-9580
```

Page 78

```
1         W. Tam
2    check marks?
3       A.  I believe so, yes.
4       Q.  Did you discuss these particular
5    requirements with anybody at the restaurant?
6       A.  I don't recall, as I told you. I
7    don't recall right now. It's twelve years ago.
8       Q.  Did you ever check to see whether or
9    not the restaurant was in compliance with this
10   record-keeping requirement at any time after
11   you received this letter in October of '95?
12      A.  I did not.
13      Q.  Do you know whether or not they were
14   in compliance with this record-keeping
15   requirement?
16      A.  I did not.
17      Q.  Did you ever see a time clock
18   machine when you visited the restaurant?
19      A.  No. They did not have a time clock.
20      Q.  Did you ever advise them at any time
21   to install a time clock?
22      A.  I did not.
23      Q.  Did you ever at any time discuss
24   with anybody whether or not a time clock should
25   be installed?
      TSG Reporting - Worldwide   (877) 702-9580
```

Page 79

```
1         W. Tam
2       A.  I did not.
3       Q.  Did you ever tell anybody not to
4    install a time clock?
5       A.  I did not.
6       Q.  At any time that you were at the
7    restaurant did you ever see a sign-in book or
8    sign-in log of any kind that was maintained by
9    the restaurant?
10      A.  In that fifteen minutes I did not
11   see it.
12          MR. KIMERLING:  Mark this as
13      Exhibit 5, please, in the William Tam
14      deposition.
15          (Plaintiffs' Exhibit 5, copies of
16      checks, Bates stamped OT 325 through
17      OT 328, marked for identification.)
18      Q.  Would you take a look at that
19   exhibit, sir.
20      A.  Yes.
21      Q.  These are copies of checks that your
22   attorneys have provided me.
23      A.  Okay.
24      Q.  Do you recognize these checks?
25      A.  These are the checks signed by Mee
      TSG Reporting - Worldwide   (877) 702-9580
```

Page 80

```
1         W. Tam
2    Mee Tom.
3       Q.  And who prepared the check itself?
4       A.  This is Mee Mee Tom's handwriting.
5       Q.  Have you ever seen these checks
6    before you turned them over to your attorney?
7       A.  I saw that when I prepared my
8    records.
9       Q.  Were the employees at the restaurant
10   paid in cash --
11      A.  Yes.
12      Q.  -- for their work?
13      A.  Yes.
14      Q.  Were they paid in cash and check or
15   just cash?
16      A.  99 percent paid in cash.
17      Q.  Some workers were paid in check?
18      A.  Some they specifically requested to
19   be paid in check and we paid them in check, and
20   Mee Mee Tom paid in check.
21      Q.  Looking at the first page of this
22   exhibit, 325 Bates stamp, you will see that
23   there are two checks made out to cash which say
24   for the August 15th payroll. Do you see that?
25      A.  Yes.
      TSG Reporting - Worldwide   (877) 702-9580
```

Page 81

```
1         W. Tam
2       Q.  Do you know why Miss Tom prepared
3    two checks for that same payroll?
4       A.  That is beyond my control. I don't
5    know. All I did is I gave her the figures.
6       Q.  Which figures?
7       A.  The total combined. Let's say the
8    payroll total for the period is 12,300. I gave
9    her the figures.
10      Q.  And you noted that she divided that
11   into separate checks; is that correct?
12      A.  Until when I saw the check, yes.
13   When I saw, you know.
14      Q.  Did you advise her to do that to
15   avoid the reporting requirement of the $10,000
16   cash check?
17      A.  No.
18          MR. McHUGH:  Objection to the form.
19      It's speculative and improper. I think the
20      witness has answered already.
21      Q.  Did you advise her that by dividing
22   her checks she may be trying to avoid
23   disclosure, which would not necessarily be a
24   proper thing to do?
25          MR. McHUGH:  Objection to the form.
      TSG Reporting - Worldwide   (877) 702-9580
```